STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-02-24
JLH-PEN- 6/24/2003

FILED & ENTERED
SUPERIOR COURT

JUN 2 4 2003

PENOBSCOT COUNTY

Christopher Rioux,
    Plaintiff/Appellee

v.

Order on Appeal

DONALD L. GARBRECHT
LAW LIBRARY

JUL 30 2003

Milos Blagojevic et al.,
    Defendants/Appellees

Pursuant to TOWN OF ORONO, MAINE LAND USE ORDINANCE § 18-179 (Ordinance) and M.R.Civ.P. 80B, Christopher Rioux appeals from a decision of the Orono Planning Board (the Board) approving a plan for establishment of a subdivision filed by defendants Milos Blagojevic and Bonnie Blagojevic (collectively, Blagojevic). Rioux also has filed three independent claims against Blagojevic. Blagojevic has filed a motion to dismiss the three independent counts, and that motion to dismiss is addressed in a separate order.

Rioux owns real estate located in Orono that abuts the site of Blagojevic's proposed subdivision, which would consist of 8 parcels and cover roughly 22 acres of the 103 parcel that Blagojevic owns there. In August 2001, Blagojevic filed an application for approval of the subdivision, along with a sketch plan for the proposed subdivision, with the Town's Planning Board. The Board held a preapplication conference in September. *See* R. 8 (transcript); Ordinance (R-1), § 18-205. Because the proposed development was to consist of at least five lots and included the construction of a road, the Board concluded that it was a "major subdivision" as the Town's ordinance defines that term, *see* Ordinance, § 18-31, and that the road was a "minor road," *id. See* R. 8 at 5, 9. Because the subdivision was "major," it was subject to the standards set out in section 18-210 of the ordinance. During that meeting, several members of the Board concluded

1

that in addition to the sketch that Blagojevic had filed with his initial application, he was required to file a second sketch plan showing a planned unit development (PUD) because the subdivision was a major one. *See* Ordinance, § 18-205(a). Blagojevic responded that although he did not intend to create a planned unit development, he was willing to do file the second sketch. *See* R. 8 at 6, 7.

Blagojevic then filed a preliminary plan for the proposed subdivision, and the Board held a public hearing on that plan on March 20, 2002. *See* R. 12 (transcript); Ordinance, § 18-206. Blagojevic and an engineer whom Blagojevic retained to design the subdivision made direct presentations to the Board. Additionally, Rioux and several other opponents to the development attended the hearing and aired their concerns. Of the several issues generated by the proposal, water drainage and runoff was the focus of the greatest attention. Blagojevic's engineer explained the drainage scheme to the Board. Rioux himself advised the Board that his property was often quite wet because it is lower than the other land in the area. *See* R. 12 at p. 9-10. Additionally, Rioux expressed concerns that the increased volume of traffic created by the expanded neighborhood population could create safety problems where the road into the subdivision intersected with the existing town road. Rioux further noted his understanding that under the ordinance, Blagojevic was required to post a performance bond. *Id.* at 10. Rioux also commented that based on his own consultations with a wildlife biologist, he felt that the subdivision plan adequately protected the deer wintering yard that exists in the area. *Id.*

After the public hearing was closed, the Board members questioned Blagojevic and the engineer about these issues. The Board advised Blagojevic to obtain written confirmation from the Department of Inland Fisheries and Wildlife that, in its view, the deer wintering area would not be damaged. *See* R. 12 at p. 20. The Board also raised the issue of the PUD sketch. Blagojevic told the Board, as he did at the September 2001 preapplication conference, that he did not intend to create a planned unit development. Two of the Board members stated that they agreed that the site of the proposed subdivision was not suited to that type of development. *Id.* at 22. The Board also noted that under the ordinance, Blagojevic was required to obtain a performance bond. *Id.* at 27. Ultimately, the Board voted to approve the preliminary plan, *id.* at 28, although that approval was subject to a recommendation that a streetlight be installed at the traffic

2

intersection, *id.* at 29. Under the ordinance, this action constituted "the expression of approval of the design submitted on the preliminary plan as a guide to the preparation of the final plan." Ordinance at § 18-206(c)(3). This set the stage for Blagojevic to prepare and submit a final plan, which he did in April.

The final plan was the subject of two public hearings. The first was held on April 17, 2002. *See* R. 22 (transcript). Rioux' attorney was present at the meeting and actively participated in the proceedings. Though counsel, Rioux raised two issues. First, he argued that the creation of the subdivision required approval from the Department of Environmental Protection, pursuant to the terms under which the area was first developed in 1978. *See id.* at pp. 4-5. Additionally, Rioux expressed the position that a proposed detention pond, included as part of the drainage system in the subdivision, encroached on his right of way that provided access to his parcel and that the detention pond would amount to a non-natural collection of water that could not be emptied lawfully onto his property in the absence of a drainage easement. *Id.* at pp. 6-8. During the hearing, a wildlife biologist, Kel Kemper, spoke to ask the Board to pay particular attention to the effects of the proposed development on the deer wintering area located on Blagojevic's property. *Id.* at pp. 9, 28-29. A review of the transcript of this public hearing reveals that Kemper's comments were quite ambiguous. Kemper stated that he largely agreed with the assessment of another wildlife biologist that the subdivision would have only a minimal impact on the deer's winter habitat and that, overall, that the plan was "congruent with what we would have liked to have seen." *Id.* at pp. 29, 31. However, Kemper also advised the Board that the plan's impact was "not quite" minimal. *Id.* at p. 30.

The Board concluded the April 17 hearing without a final vote on the subdivision plan, in order to give Blagojevic an opportunity to make some revisions to his plan in response to the issues raised at that meeting. Specifically, he was asked to change the location of the detention pond that encroached on Rioux' right of way, to establish whether DEP approval was needed for the development as a result of the 1978 plan, to confirm in writing that the road into the subdivision would be dedicated to the Town and to secure an improvement guarantee. Additionally, the Board expressed an intention to

3

ask the Town's attorney to provide guidance on a provision of the ordinance relating to the drainage criterion. *Id.* at pp. 34-36.

Following the Board's April meeting, in May, Blagojevic filed an amended final subdivision plan, which was designed in part to address issues regarding water runoff and drainage. *See* R. 34. He and the town manager also executed an improvement guarantee escrow agreement, supported by several other documents, despite the concerns expressed by the Town's attorney regarding the sufficiency of the guarantee's terms. *See* R. 29-33.

The Board's public hearing on the subdivision application resumed and was completed on July 17, 2002. *See* R. 43 (transcript). Rioux appeared and was heard both directly and through counsel. Rioux' presentation focused entirely on the development's effects on the flow of water onto his property. Indeed, toward the beginning of the hearing, during a lengthy comment that Rioux' counsel made to the Board on the drainage issue, the chair of the Board asked counsel, "Mr. Miller, is there, other than drainage, is there, are there any other issues?" The chair continued,

> Because what we're going to do is we're going to drill down through this thing and we're really going to take it apart and make sure that we understand the impact and get a good understanding of exactly what is being proposed; and if we can, if we feel that it meets the ordinance, you know, based on our understanding of the ordinance, and based on our understanding of what our attorney has told us, is there another issue beside drainage?

Counsel replied, "No, but I'd like to finish because number one we're building a record, and number two, I'd like to just, I have a few more photographs to go through, I want to talk." R. 43, p. 6. Rioux' attorney then completed his remarks about water drainage onto Rioux' property. Later during the hearing, Rioux' counsel spoke again on the same issue. *Id.* at p. 21.

After the parties' presentations were completed and the public hearing was closed, the Board's chair systematically identified each of the separate standards that, under the ordinance, must be satisfied to secure the Board's approval of the proposed development. *See* Ordinance at § 18-210. For all but one of those criteria, Board members had the opportunity to express their thoughts, although they did not actually do so for each point. When the chair reached the standard germane to water drainage, he said, "We've had plenty of debate upon it. . . .We're going to debate that in a just a moment." R. 43 at p.

28. He then went on to the next standard in the ordinance. When he completed his identification of the standards as set out in section 18-210, however, neither he nor any other Board member sought to return to a discussion or "debate" on the question of whether the subdivision plan satisfied the water drainage criteria established in section 18-210(c). Rather, the chair solicited a motion and then himself moved to approve Blagojevic's subdivision plan. Without any further substantive discussion, the Board then voted to approve the final subdivision plan by a vote of 5 to 1.

Rioux filed a timely appeal of that decision to this court. *See* Ordinance at § 18-179 (allowing direct appeal of the Board's decisions to the Superior Court). On this appeal, he makes a number of arguments: that Blagojevic failed to file a sketch required by the Town's land use ordinance as part of the subdivision approval process; that the financial guarantee tendered by Blagojevic failed to satisfy the ordinance's requirements; that Blagojevic has not obtained necessary approval for the development from the state Board of Environmental Protection, which Rioux argues is required because of the fact of the development proposal itself and because of the subdivision's impact on a nearby deer wintering area; and that the subdivision proposal itself does not comply with the requirements established in the ordinance for water drainage, sidewalks and culverts. Rioux also contends that the Board failed to issue adequate findings of fact and conclusions sufficient to satisfy the applicable statutory requirement and to allow meaningful review on appeal.

## A. Preservation of challenges to the Board's decision

In defending the Board's decision on this appeal, the Town and Blagojevic argue that Rioux has failed to preserve several of the issues which form the basis for his challenge to that decision. On this basis, they argue that he has waived those challenges. In particular, they claim that during the administrative process Rioux did not make sufficient objections to the arguments he pursues here regarding the sufficiency of the sketch plans, the deer wintering area, any need for BEP approval, sidewalks and culverts, and the improvement guarantee.

In order to preserve an issue for appellate review, a party must bring that issue to the attention of the lower tribunal. Otherwise, any subsequent contention on appeal is

waived. *Berry v. Board of Trustees*, 663 A.2d 14, 18 (Me. 1995). In this way, that municipal decision-maker is given the opportunity to pass on the issue in contention, and the appellate court in fact functions in review of the decision made below. *See Oliver v. City of Rockland*, 1998 ME 88, ¶ 7, 710 A.2d 905, 907. This principle is also one of fairness because it requires that issues must be brought to the attention of the initial decision-makers. *Berry*, 663 A.2d at 18. "An issue is considered raised and preserved for appeal if there is sufficient basis in the record to alert the court and any opposing party to the existence of that issue." *Wells v. Portland Yacht Club*, 2001 ME 20, ¶ 5, 771 A.2d 371, 373. This requirement applies even to appellate arguments of appellate dimension. *Maine Real Estate Comm'n v. Kelby*, 360 A.2d 528, 530 (Me. 1976). Because the purpose of this requirement is to ensure that issues subsequently raised on appeal in fact were decided by the municipal body, then it should make no difference whether the appellant (here, Rioux) or some other party raised the issue or made the argument during the course of the administrative process. So long as *someone* raised the issue, the issue has been preserved for appellate consideration, because there is the assurance that the matter was brought expressly to the Board's attention and that the Board thus considered its merits. Consequently, an argument that Rioux makes here is in order for appellate consideration if he or some other person raised that issue during the municipal process. *But see State v. Brown*, 410 A.2d 1033, 1036 (Me. 1980). The court rejects any argument that Rioux' fingerprints must be on each argument he makes here.

On this basis, the court considers the defendants' contentions that several of the issues that the plaintiff raises on this appeal were not properly preserved.

**(1) PUD sketches**

The Town's Ordinance requires that a prospective subdivider of a major subdivision, such as the one at issue here, file two sketch plans: one with the dimensional requirements set out in the ordinance, and a PUD sketch. Ordinance at § 18-205(a). Ultimately, although the Board may recommend which of the sketches should form the basis for the formal application, the applicant is entitled to make the "final decision on which sketch plan to follow as a guide to prepare and submit a formal application." *Id.* at § 18-205(e). Here, Blagojevic filed a sketch plan, which depicts the lots in conformity with the dimensional requirements applicable to the zoning district where the subdivision

6

was to be established. This satisfied the requirements of one of the two sketch types. *See id.* at § 18-205(a)(1). However, Blagojevic did not submit a sketch showing a PUD, as section 18-205(a)(2) requires.[1] At the September 2001 preapplication conference, the Board reminded Blagojevic that the ordinance required him to file the PUD sketch. At the next meeting, which Rioux attended, the issue came up again. There, it was noted that Blagojevic had not filed a PUD sketch. After Blagojevic repeated his position that he was not interested in a PUD project, several of the Board members noted that there was no point in requiring Blagojevic to submit a PUD sketch.[2] Subsequent to that meeting, Blagojevic submitted a formal application for the major subdivision, and the PUD issue was not raised again.

Rioux has not preserved Blagojevic's failure to submit a PUD sketch for appellate review here. Although the issue was raised at several early meetings, the record reveals that at least several Board members considered the requirement to be senseless in this case because Blagojevic had no intention to create a PUD. Thus, irrespective of whether the Board had recommended to Blagojevic that the final plan constitute a PUD, nothing in this record supports a contention that he would have acceded to such a suggestion. Rioux did not press the manner in which the Board appears to have resolved this issue, and in fact his subsequent express waiver of any challenge to any issue other than the water drainage must be seen to encompass the PUD sketch claim. Therefore, even if a developer's failure to file a PUD sketch pursuant to section 18-205 can vitiate a Board's subsequent approval of a conventional major subdivision, that argument cannot be considered here.

## (2) Improvement guarantee

Section 18-209 of the ordinance requires an applicant for a major subdivision, such as Blagojevic, to file an improvement guarantee with the Town to provide the municipality with the independent financial means to complete the construction of

---

[1] In his written argument, Blagojevic asserts that he in fact submitted a PUD sketch to the Board. From the court's review of the record, this assertion does not appear to be correct.

[2] One Board member remarked, "I think that whole thing was kind of ridiculous to require it [the PUD sketch] and yet he [Blagojevic] makes the final decision on which one he wants to pursue." R. 12 at p.22.

improvements if the developer does not do so pursuant to the approved subdivision plan. Some of the terms of such a guarantee are specified in section 18-209. Here, Rioux argues that the improvement guarantee that Blagojevic provided to the Town did not satisfy the ordinance's requirements. The defendants respond in part that Rioux did not preserve this issue for appellate review.

The improvement guarantee was discussed at the preapplication conference held in September 2001 and at the first public hearing after the final plan was filed, in March 2002. At both of these meetings, the Board advised Blagojevic of the need for him to provide the guarantee. *See* R. 8 at pp. 9, 27; R. 22 at p. 35-36. By letter dated April 8, a representative of Merrill Lynch wrote to the town manager, advising that Bonnie Blagojevic had cash of $75,000 on account there. *See* R. 29. From the parties' arguments, the court infers that this confirmation of account supported a draft escrow agreement that, when signed, appears in the record as exhibit 32. At nearly the same time, Blagojevic's engineer provided Blagojevic with a written estimate for the costs of constructing the proposed subdivision. *See* R. 30. That cost would be nearly $75,000 – within the amount of Bonnie Blagojevic's Merrill Lynch account. In apparent response, the Town's attorney expressed his view that the agreement, based on the funds at Merrill Lynch, was flawed in several respects. *See* R. 31. Nonetheless, Blagojevic and the Town executed the escrow agreement as supported by an irrevocable letter of credit issued by a local bank. *See* R. 32-33. To the extent that the Town's attorney has raised issues that are cognizable here, then those issues are in a posture for appellate scrutiny.

However, the ordinance vests the Board with very little decision-making authority resulting from the improvement guarantee. Under the procedure prescribed by section 18-209, the developer must file the proposed guarantee with the town manager. Ordinance at § 18-209(b). The town manager then decides whether the proposed guarantee is "sufficient." *Id.* If the town manager concludes that it is not, then the developer is advised of that decision. *Id.* On the other hand, the town manager notifies the Board if he concludes that the proposed guarantee is sufficient. "The Planning Board shall not grant final approval until is has received such notification from the Town Manager." *Id.* Thus, the Board has no authority to independently assess the terms of the guarantee and its sufficiency under the standards set out in section 18-209. Here, the

8

letter of the Town's attorney was directed to the town manager and its CEO, presumably as part of the process when the former evaluated the proposed guarantee. That the town manager signed the guarantee, *see* R. 32, shows that he approved its terms. Subsequently, the Board's sole consideration was whether the town manager has notified it of his approval of the guarantee.

Because the Board is expressly excluded from the process of evaluating the sufficiency of the guarantee, the only issue that can be addressed on this appeal from the Board's ultimate decision is whether proper notification was provided. The record supports an inference that it was, because the agreement was signed on June 2, 2002, well over a month prior to the date of the Board's decision to approve the subdivision. Consequently, Rioux' challenges to the guarantee are not the kind of challenges that are cognizable here, because under the terms of the ordinance, the sufficiency of the guarantee – which is the basis for Rioux' contentions – is not within the Board's authority to consider. Therefore, even assuming that the specific questions raised in counsel's May 10 letter would be preserved for review here, Rioux has not preserved the only issue that he could raise on this appeal regarding the guarantee, which is the issue of whether the town manager approved it and advised the Board of that decision.

### (3) BEP approval for further development

The land that is the subject of the subdivision was also the subject of a site location order issued by the Department of Environmental Protection in 1978. *See* R. 3. As a term of the DEP's approval of the 1978 development, "[a]ny proposed development of lot #8 [now Blagojevic's lot] shall be submitted for review and approval by the Board [of Environmental Protection]." *Id.* Rioux argues here that BEP approval for the proposed subdivision was not secured and that the Town's Board erred in approving the proposed subdivision because until the BEP itself approved the plan, the subdivision could not conform to "all pertinent State" laws. *See* ordinance at § 18-210(a)(1).

This condition affecting further development was discussed at the April 2002 meeting, when Rioux' attorney acknowledged that DEP may have waived any such requirement. *See* R. 22 at p. 4. This comment have been based on the April 24, 2002, letter sent by a DEP representative to Blagojevic, *see* R. 34, and to Blagojevic's own statement, made earlier during that hearing, when he said that he has consulted with DEP

9

and that "they are not interested here. . .we are below their radar." *Id.* at p. 2. Then, at the July 2002 hearing, Blagojevic advised the Board that he "had clarified some issues with DEP, and got a letter from them in regards to a certain site location order [the 1978 order], which, uh, could have been interpreted as a stop to any further development. But I think it's clearly, uh, letter from them clearly lifts the curse of that site location order in regards to future development." R. 43 at p. 1. Blagojevic had submitted a copy of this letter prior to the July meeting. *See* R. 34.[3] After Blagojevic made some other preliminary comments, Rioux' attorney then made his lengthy statement, including his comment that he objected to the proposed development on the sole ground that, in his view, it did not satisfy the ordinance's requirements for water drainage. By then, the Board had been advised that due to statutory changes subsequent to 1978, the BEP did not need to approve the subdivision. Rioux never made an argument to the contrary in the face of this prsentation. Thus, in this context, Rioux' failure to identify any predicate DEP/BEP approval as a basis for his objection to the proposed subdivision amounts to a waiver of that issue for appellate purposes.[4]

### (4) Impact on deer wintering area

Section 18-210(d)(3) of the Town's ordinance provides that a subdivision applicant must demonstrate the absence of a significant adverse effect on a wildlife habitat and the deer supported by that habitat, if any part of the proposed subdivision is within 250 feet of an area "identified and mapped by the Department of Inland Fisheries and Wildlife as a high or moderate value deer wintering area or travel corridor." That is the case here. In order to satisfy the burden created by section 18-210(d)(3), the applicant may submit a report written "by a wildlife biologist with demonstrated

---

[3] From the record, it is not clear when the letter was filed with the Board or when it became available to the participants at the hearing.

[4] Even if this issue had been preserved, it would not entitle Rioux to relief on this appeal because the record, *see, e.g.,* R. 34, provided the Board with a basis on which to conclude that DEP approval was not necessary to allow the Board, in turn, to approve Blagojevic's subdivision application. *York v. Town of Ogunquit,* 2001 ME 53, ¶ 6, 769 A.2d 172, 175 (municipal's board's decision is for findings not supported by substantial evidence).

10

experience with the wildlife resource being impacted. . . ." *Id.* The ordinance goes on to identify the contents of such a report.

Here, at the March 20 meeting, Rioux himself commented to the Board that he had reviewed the preliminary subdivision plans and that, with respect to the development's effects on the deer wintering area, "those plans are well done." *See* R. 12 at p. 9. Subsequently, at the April 17 meeting, the deer wintering area issue was raised by Kel Kemper, a regional biologist with IFW. Kemper made some comments regarding a report that had been prepared by Lyman Feero, a certified wildlife biologist, and that Blagojevic had filed with the Board.[5] *See* R. 34. In that report, Feero concluded that "[t]he proposed subdivision will have minimal impact on the deer wintering habitat. . . ." *Id.* Kemper advised the Board that he had little disagreement with that conclusion, although he also suggested that the development was "not quite there," meaning that its impact would not quite be minimal. *See* R. 22 at p. 29-31. However, Kemper's concern was less with the development proposal before the Board than with further development. *Id.* at 30. Kemper also told the Board that Feero is "a wildlife biologist in good standing with this State." *Id.* at p. 32.

Consequently, prior to Rioux' counsel's comments at the July 17 meeting where he disclaimed any arguments other than ones relating to water drainage, the compliance of Blagojevic's subdivision proposal with section 18-210(d)(3) had been raised. No person had argued that Feero's letter fell short of the showing that Blagojevic was required to make. In light of this, Rioux has not preserved this substantive issue for appeal.[6]

---

[5] The date of that submission is not made clear in the record, and the report itself is undated. However, Kemper discussed that report at the April meeting, so one can infer that it was submitted prior to that meeting.

[6] Rioux may be seen to argue in part that the Board failed to issue adequate findings on this point. Unlike the drainage issue discussed below, the Board's decision on the wildlife habitat effects was a binary one. Either the Board was satisfied that Blagojevic had shown the absence of a significant adverse impact on the deer wintering yard, or it was not satisfied with that aspect of the proposed subdivision. Because the Board approved Blagojevic's application, it had to have been persuaded by Blagojevic's presentation on this issue, which rested entirely on Feero's report. Thus, although the

11

## (5) Sidewalks and culverts

Rioux challenges the Board's decision that the subdivision plan fully conformed to the requirements of section 18-210(e)(1)(i). That provision sets out minimum design standards for streets and sidewalks. Item 15 controls sidewalks, and item 20 controls culverts. Rioux argues that the proposed subdivision does not satisfy these two requirements.

First, item 15 specifies certain features for sidewalks along roadways. In fact, the road into Blagojevic's subdivision would not have any sidewalks. Because of this, at the July 17 meeting, Blagojevic requested the Board to grant him a waiver of that requirement. *See* R. 43 at p. 32. Under the ordinance, the Board may waive any of the requirements attendant to a subdivision if it finds that "strict compliance" with those mandates would create an "extraordinary and unnecessary hardship" or if "special circumstances" warrant such a waiver. Ordinance at § 18-82(a). When the Board grants such a waiver, it "shall require such conditions as will, in its judgment, secure substantially the objectives of the requirements so waived." *Id.* Here, despite Blagojevic's express request for a waiver of the requirements relating to the sidewalks, the Board did not act on it.

The manner in which this issue was raised before the Board is sufficient to preserve it for appellate review. Blagojevic himself brought up the issue in a manner that was reasonably designed and sufficient to prompt the Board's consideration of the request. Further, the matter arose subsequent to the time when Rioux, through counsel, affirmatively limited his objection to the drainage issue. Therefore, because the Board was asked to address the need for sidewalks as an element of the road system in the subdivision, and because the issue was not subsequently disclaimed, it has been preserved.

As part of his argument under section 18-210(e)(1)(i), Rioux also argues that the Board erred in its apparent finding that the culverts in the subdivision satisfied the requirements imposed by item 20. This provision relates directly to the question of whether the water drainage system planned for the subdivision meets the ordinance's

---

absence of comprehensive findings by the Board is problematic in the ways discussed below, that is not the case on this point.

12

standards. Rioux clearly has preserved his arguments associated with this general issue, and the court therefore finds that this claim is preserved.

### B. Standing

The defendants have also argued that Rioux does not have standing to pursue some of the issues he has raised on this appeal. The defendants do not raise this argument regarding Rioux' objections that focus on water drainage. The remaining issue that is subject to appellate review here is the approval granted by the Board without a finding that Blagojevic is not required to comply with the requirements for a sidewalk. The defendants argue that Rioux does not have standing to raise this issue.

The defendants examine the requirement of standing too narrowly. In order to establish standing to challenge municipal action in court, the appellant "must (1) have appeared before the [municipal] board. . .; and (2) be able to demonstrate a particularized injury as a result of the board's action." *Sproul v. Town of Boothbay Harbor*, 2000 ME 30, ¶ 6, 746 A.2d 368, 371 (punctuation and citation omitted). The defendants' standing analysis rests not on the outcome of the Board's decision and the impact of that decision on Rioux, but on the specific nature of Rioux' argument on appeal: if Rioux is not affected by the specific ground on which he challenges the Board's decision, they argue, then he may not challenge the ultimate decision itself. However, the standing inquiry is not limited to an examination of the reasons for the municipality's actions and the relationship between the appellant and those reasons. Rather, the test of standing examines whether the appellant has suffered an injury as a result of the decision itself.

Further and more fundamentally, as it has been examined in federal authorities, the concept of standing is both constitutional and prudential in origin. The participation of a party with standing ensures that a court will be presented with a "case and controversy," in satisfaction with the constitutional element of jurisdiction. In that way, advocacy by a party with standing provides assurance that that party will be motivated to address the contested issue with seriousness and maturity, because that party has a real interest at stake. *See generally Clinton v. City of New York*, 524 U.S. 417, 429, 141 L.Ed.2d 393, 408 (1998). *See also Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 687, 37 L.Ed.2d 254, 269 (1973) (". . . .[T]he party seeking review [must]

13

be himself among the injured, for it is this requirement that gives a litigant a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders."); *Baker v. Carr*, 369 U.S. 186, 204, 7 L.Ed.2d 663 (1962) (to have standing, a party must allege "such a personal stake in the outcome of the controversy as to assure that concerted adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.").

Here, the record establishes that Rioux is exposed to a particularized injury by the Board's approval of Blagojevic's subdivision application. Because his relationship to that municipal decision and its effects on him provides assurance that he is sufficiently and legitimately motivated to press his challenge to it, and because Rioux has standing to raise these issues based on the conventional formulation of the standing requirement, the court is satisfied that he has legal standing to do so.

### C. Sufficiency of the Board's findings

There remain two issues that Rioux may pursue on this appeal: the Board's implied conclusion that the proposed subdivision satisfies the ordinance's requirements for water drainage, and its implied conclusion that Blagojevic is exempt for the sidewalk requirements associated with roadway layout and construction. The next issue to address here is whether the Board issued adequate and sufficient findings on these issues. The court concludes that it did not.

The parties do not dispute a municipality's general responsibility to issue findings in support of its decision. That obligation is based on statute, *see, e.g.*, 30-A M.R.S.A. § 4403(6) (municipal reviewing authority's decisions on subdivision applications); 1 M.R.S.A. § 407, and on caselaw, *see, e.g.*, *Widewaters Stillwater Co., LLC v. Bangor Area Citizens Organized for Responsible Development*, 2002 ME 27, 790 A.2d 597; *Christian Fellowship and Renewal Center v. Town of Limington*, 2001 ME 16, 769 A.2d 834. In addition to the fact that the statutes noted above require the issuance of such findings, such findings are essential to meaningful appellate review because, in the absence of such findings, the parties and the court on appeal will have difficulty identifying the basis for the decision and the subject of that appellate analysis. *Christian*

14

*Fellowship*, 2001 ME 16, ¶ 15, 769 A.2d at 839. Further, constitutional interests may be at stake. *Id.*, ¶ 17, 769 A.2d at 839. Municipal decision-makers are required to issue such findings on their own initiative because, unlike court procedures, there is no mechanism for the parties to request and obtain an articulation of the reasons for the lower decision. *Id.* ¶ 18, 769 A.2d at 840.

Here, after the public hearing on Blagojevic's application was closed, the Board's chair recited the standards that Blagojevic's proposal was required to satisfy under the Town's ordinance. The Board then voted to approve that application. There was, however, no deliberative discussion whatsoever among the Board members on the question of whether the application complied with the Town's standards for drainage. Further, notwithstanding the absence of any sidewalks on the road design, there was no discussion of whether in the Board's judgment, Blagojevic qualified for a waiver of that requirement. Thus, on these issues, the Board did not issue express findings.

The defendants argue that, from the Board's decision to approve the subdivision application, the court may infer that the Board decided those issues favorably to Blagojevic. Even if, in light of the Law Court's strong, recent trend toward an insistence on an explicit rendition of an agency's findings, a court is still permitted to attempt to rely on assumed findings if they are obvious or can be inferred from "stated conclusory facts," *Chapel Road Associates, LLC v. Town of Wells*, 2001 ME 178, ¶ 12, 787 A.2d 137, 140, in the case at bar, such findings cannot be assumed from the mere fact that the Board approved Blagojevic's application. If it is assumed that that Board in fact actually decided favorably to Blagojevic on the two particular remaining issues (drainage and sidewalks), then there are several ways the Board might have decided to reach those conclusion. With respect to drainage, the express terms of the ordinance require the Board to consider changes in the rate of water flow occasioned by the creation of the subdivision. Ordinance at § 18-210(c)(2). However, beyond this, the Town's attorney advised the Board that under section 18-210(c)(1), its ultimate decision on the adequacy of the drainage system could also take into account any changes in the volume of water resulting from the development. *See* R. 24. Similarly, section 18-210(c)(3) may allow consideration of factors beyond those specifically noted in section 18-210(c) generally. Further, as the Town's counsel pointed out, 30-A M.R.S.A. § 4404(16) requires a

15

municipal reviewing authority to consider whether "[t]he proposed subdivision will provide for adequate storm water management. . . ." *See id.* In the proceedings below, considerable attention was paid to the water issues generated by the proposed development. That attention, however, took the form of interchanges between some Board members, interested parties and members of the public. The Board's decision to approve the application does not shed light on the factual basis for any implied finding that that drainage system met all of the applicable requirements. Rather, the particular drainage analysis that a Board might follow in a case such as this is not straightforward: there are several issues that the Board might – or might not – consider, depending on the nature of its predicate factual findings.

Similarly, even if it is assumed that the Board found cause to grant a waiver of the sidewalk requirement,[7] the parties and the court are entitled to an explanation for such a waiver in order that the matter can be considered properly on appeal. The record does not disclose a basis for Blagojevic's request for the waiver; the Board did not discuss it; and that issue was not put to a vote. There is no basis on which to infer the Board's reasoning in support of any such waiver, and there is no record from which those reasons are so obvious that express findings would be superfluous.

Therefore, this case must be remanded to the Planning Board to allow it to issue findings of fact on those aspects of Blagojevic's subdivision application relating to drainage facilities and sidewalks. "When the Superior Court remands to an administrative board or agency for the purpose of having it take further action reviewable by the Superior Court, the court should retain jurisdiction awaiting the outcome of those further administrative board or agency proceedings." *Valdastri v. City of Bath*, 521 A.2d 691, 692-93 (Me. 1987). Therefore, despite the pendency of Rioux' independent claims against Blagojevic, this case may be remanded to the Planning Board without the need to await a final judgment on counts 2-4. The remand order on count 1 would not amount to

---

[7] This assumption would be weak because the Board appears to have completely passed over Blagojevic's express request that the Board grant him that waiver. There was simply no meaningful discussion of the issue at all. Also, the Board did not discuss or impose any separate conditions to substitute for any waived requirements. *See* Ordinance at § 18-82(a). From the record, it cannot be concluded with any assurance that in fact the Board gave the request any thought.

a final judgment under *Valdastri*. Accordingly, there is no reason to wait for a final disposition of Rioux' claims in the remaining counts, prior to the time when the Board should have the opportunity to formulate and issue adequate findings.

The entry shall be:

Order issued on count 1 of the complaint, seeking relief under M.R.Civ.P. 80B. That part of the case relating to the plaintiff's appeal from the decision of the Town of Orono Planning Board is remanded to the Board for further findings of fact consistent with this order. Due to the pendency of the independent claims set out in counts 2-4 of the complaint, this case shall otherwise remain      pending in the Superior Court.

Dated: June 23, 2003

Justice, Maine Superior Court
Jeffrey L. Hjelm

17

STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-02-24
JLH- PEN- 6/30 2003

FILED & ENTERED
SUPERIOR COURT

JUN 3 0 2003

PENOBSCOT COUNTY

DONALD L. GARBRECHT
LAW LIBRARY

JUL 20 2003

Christopher Rioux,
        Plaintiff/Appellant

v.

Order (Motion to Dismiss)

Milos Blagojevic et al.,
        Defendants/Appellees

Pending before the court is the motion of Milos Blagojevic and Bonnie Blagojevic (collectively, Blagojevic) to dismiss counts 2, 3 and 4 of the plaintiff's complaint as amended.[1] In this action, the plaintiff pursues an appeal pursuant to M.R.Civ.P. 80B from a decision of the Town of Orono Planning Board, approving Blagojevic's application for a subdivision development. The merits of that appeal have been addressed in a separate order. In addition to that appeal, the plaintiff has asserted three independent claims against Blagojevic: in count 2, he alleges that the proposed subdivision is prohibited by one or more orders issued by the State of Maine Department of Environmental Protection; in count 3, he alleges that the subdivision is in violation of the Town's land use ordinances; and in the final count, he alleges the common law tort of trespass. In the motion at bar, Blagojevic seeks to dismiss each of these independent claims on the ground that they do not allege a basis for relief under Maine law. *See* M.R.Civ.P. 12(b)(6).

---

[1] In response to the pending motion, the plaintiff filed a motion to the complaint. That motion was granted without objection. In Blagojevic's response to the plaintiff's motion to amend, he contends that the amendments to the complaint do not affect the merits of his motion to dismiss and that he does not wish to be heard further on the legal effects of the amendments.

1

"A motion to dismiss tests the legal sufficiency of the complaint." *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994). On a motion to dismiss, the complaint must be examined "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* A dismissal is proper "only when it appears beyond doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim." *Hall v. Board of Environmental Protection*, 498 A.2d 260, 266 (Me. 1985). The motion at bar invokes an examination and analysis of the complaint (as amended) within its four corners. Consequently, except as is noted below, the court cannot and does not consider the nature of evidence that the parties might present in support of their respective positions on the merits of the plaintiff's claims, although that evidence in part may consist of some of the data that are included in the record on appeal. *See Baker's Table, Inc. v. City of Portland*, 2001 ME 7, ¶ 14, 743 A.2d 237, 242.

In his complaint as amended, the plaintiff alleges that Blagojevic applied for and obtained approval for an 8 lot subdivision in Orono. Complaint at ¶¶ 6, 9. During the Planning Board proceedings resulting in that approval, the plaintiff objected to the proposed development because the drainage plan for the subdivision would cause storm water to drain onto property that he owns. *Id.* at ¶ 9. Rioux alleges the property that would be the site of the subdivision is subject to two site location orders that were issued by the Board of Environmental Protection and that as a result of those orders, the property may not be developed in the absence of BEP approval. *Id.* at ¶¶ 13-14. Rioux claims that Blagojevic in fact engaged in excavation and other groundwork without first obtaining BEP approval. *Id.* at ¶¶ 16-17. He also claims that Blagojevic in fact began site work prior to the time the Town's Planning Board approved the subdivision application, thereby violating the Town's land use ordinance. *Id.* at ¶¶ 20-21. He finally alleges that the plans for the proposed subdivision include "an artificial storm water drainage system" that would "artificially impound" and then discharge water onto his property without an easement, thereby constituting a trespass. *Id.* at ¶¶ 24-26, 29.

A. Count 1 (violation of site plan order)

Blagojevic argues that there is no private right of action flowing from an alleged violation of a site location order issued by the BEP. Both Blagojevic's analysis and the

2

plaintiff's response to the motion are based on an examination of whether the provisions of 38 M.R.S.A. § 347-A *et seq.* create a private cause of action that would allow the plaintiff to proceed with his claim in count 2. As is noted above, Blagojevic's motion tests only the sufficiency of the allegations. The complaint does not include or incorporate copies of the site location orders, and thus the terms of those orders and perhaps even it basis are not defined in the pleadings. However, the parties have proceeded on the premise that the statutory provisions noted above apply to their arguments on this motion. While, strictly speaking, the limited record on this motion would not allow consideration of this extrinsic material, the parties to this motion have advanced their positions based on the conclusion that the site location orders are subject to the statute. The court thus accepts this predicate as well.

As the parties have framed the issue, the BEP's authority to issue the site location orders is found in 38 M.R.S.A. § 341-A *et seq. See, e.g.,* 38 M.R.S.A. §§341-B, 341-D. Sections 347-A, 348 and 349 establish the procedures for actions designed to enforce the Board's orders. The express terms of these enforcement statutes extend only to actions taken by the agency itself or the Attorney General. Nonetheless, the plaintiff argues that there exists a private right of action that gives him, as a private citizen, the authority to obtain relief for violations of a BEP order. Historically, "when the Legislature deemed it essential that a private party have a right of action, it has expressly created one." *Larrabee v. Penobscot Frozen Foods*, 486 A.2d 97, 101 (Me. 1984). In the absence of any express creation of a private right of action, one can only be implied. *Id.; In re Wage Payment Litigation*, 2000 ME 162, ¶ 7, 759 A.2d 217, 222. Here, the comprehensive legislative structure found in the enforcement provisions does not reveal an intention by the Legislature that, on top of those processes, there is also a private right of action.

Under section 347-A, it is the DEP commissioner who has the authority to initiate an enforcement action, 38 M.R.S.A. § 347-A(1)(A), although the Attorney General also has the power to enforce a DEP order, *id.,* § 347-A(5). Before the commissioner may take any action, however, the commissioner must provide the prospective respondent with a notice of violation, which includes a description of proposed remedial measures. *Id.,* § 347-A(1)(B). If the commissioner is not satisfied with the response, then an enforcement action may be commenced in the one of the four ways specified in section

3

347-A(1)(A). The statute goes on to establish the procedures for the administrative hearing. *Id.*, § 347-A(2). Section 348 governs judicial enforcement proceedings, which include actions for injunctive relief and for civil or criminal penalties. Such actions are to be commenced by the Attorney General. *Id.*, § 348(1). Under section 349, the court is authorized to impose both criminal and civil monetary penalties.

These mechanisms for enforcement of BEP orders are both comprehensive and administrative in nature. The Legislature has carefully established a process by which alleged violators may be brought into compliance with those orders and penalized for their transgressions. It is difficult to imagine that, in the face of these detailed procedures, the Legislature also intended that a private citizen would have the right to pursue a violation in a conventional and independent action. Consequently, the court cannot conclude that the Legislature intended to create a private right of action to supplement the enforcement and remedial mechanisms found in the relevant statutes.

The plaintiff also argues, in opposing the motion to dismiss count 2, that the BEP's order is a restrictive covenant and thus one that he can enforce privately. A restrictive covenant is a contract. *Whiting v. Seavey*, 159 Me. 61, 68 (1963). It arises "out of an agreement between private parties who may, in the exercise of their constitutional right of freedom of contract, impose whatever restrictions upon the use of their lands that they desire, such covenants being enforceable only by those in whose favor they run." *Id.* at 66. A zoning ordinance or land use regulation, on the other hand, is a manifestation of governmental police power and "is entirely divorced in concept, creation, enforcement and administration" of restrictive covenants. *Id.*

The plaintiff's allegations in count 2 do not arise from contractual concepts of restrictive covenants. Rather, the plaintiff plainly seeks to enforce an administrative order governing the use and development of some of the land at issue. Even with liberal notions governing the construction of pleadings, he has not stated a cause of action that ultimately rests on the enforcement of a privately created covenant. Therefore, count 2 cannot be sustained as a claim that Blagojevic has violated a restrictive covenant.

**B. Count 3 (violation of Town land use ordinance)**

In count 3, the plaintiff seeks damages based on a claim that Blagojevic commenced construction on the proposed development prior to the time the Board

4

approved the subdivision application. The plaintiff is not entitled to relief on this theory. In the complaint, he alleges that the Planning Board in fact approved the subdivision application. *See* complaint at ¶ 9. This, of course, allowed Blagojevic to perform the work that, in count 3, the plaintiff alleges that Blagojevic performed anyway. In count 3, the plaintiff has not alleged any damages that he would not have sustained if Blagojevic had delayed commencement of those site activities until after the Planning Board approved the application, and no such damage can be implied from the pleadings. Further, the plaintiff does not argue that his rule 80B appeal from the decision of the Planning Board triggers a stay of Blagojevic's right to begin development activities at the site. Thus, any work that Blagojevic has performed is work that was or would have been authorized upon approval of the plan by municipal board.

Blagojevic argues alternatively that the plaintiff does not have a private right of action to bring suit for violations of the land use ordinance. The Law Court has reached a similar conclusion in several cases. *See, e.g., Charlton v. Town of Oxford*, 2001 ME 104, 774 A.2d 366; *Herrle v. Town of Waterboro*, 2001 ME 1, 763 A.2d 1159. The Court's analyses in those two cases, however, rested on the particular provisions of the municipal ordinances at issue. Here, the ordinance is not part of the pleadings, and the motion at bar is not one for summary judgment, where extrinsic evidence may be considered. Therefore, on the limited record on this motion, it is not possible to determine whether a right of enforcement or remedial action is reserved to a private party. The court cannot and does not reach this argument. However, for the separate reasons noted above, count 3 does not provide a basis for relief to the plaintiff, and it is subject to dismissal.

### C. Count 4 (trespass)

Finally, Blagojevic contends that Maine's trespass law does not entitle the plaintiff to relief based on claims of water runoff and drainage from the subdivision. The plaintiff has alleged specifically that under the drainage plan, Blagojevic would create "artificial retention ponds" on his (Blagojevic's) property and that the water collected in those bodies would then flow, by means of an "artificial drainage system," onto the plaintiff's land. *See* complaint (as amended) at ¶¶ 27-28.

Under Maine law, a landowner cannot be held liable "merely from the obstruction, or diversion, of the natural drainage of surface water."[2] *Johnson v. Whitten*, 384 A.2d 698, 700 (Me. 1978). *See also id. at 701; Pettengill v. Turo*, 159 Me. 350, 355 (1963) ("obstructing the flow of surface water" is not actionable); *Morrison v. Bucksport & Bangor Railroad Co.*, 67 Me. 353, 356 (1877). This situation, however, is distinguished from one where the landowner "artificially collected water on his own land which was discharged upon the land of plaintiffs where it would not otherwise naturally have fallen." *Johnson*, 384 A.2d at 700. *See also McRae v. Camden & Rockland Water Co.*, 138 Me 110, 112-13 (1941). As the affirmed judgment in *McRae* demonstrates, a landowner is liable for damages resulting from discharge of water under those circumstances.

Additionally, a landowner may be found liable if he has "stopped up or diverted" a watercourse and thereby caused damaged to another. *Johnson*, 384 A.2d at 701. *See also Pettengill*, 159 A.2d at 355 ("obstructing a watercourse" is tortious conduct); *Morrison*, 67 Me. at 356 ("A water course cannot be stopped up or diverted to the injury of other proprietors.").

The allegations in the complaint are sufficient to bring the plaintiff's claim in count 4 outside of the parameters of nonactionable conduct. The plaintiff has alleged that the drainage system designed by Blagojevic will include an artificial reservoir and that the collected water will then be released onto the plaintiff's property. If the discharged water "would not otherwise naturally have" ended up on the plaintiff's property, *see Johnson*, 384 A.2d at 700, then that discharge is a form of trespass. The plaintiff's allegations do not preclude such a showing. Although this element is not specifically alleged in the complaint, it may be fairly inferred from the nature of the claim, including its explicit designation as a "trespass action." *See* complaint (as amended), ¶ 29.

---

[2] This appears to be a departure from the law as viewed elsewhere. Under the Restatement, a landowner may be liable under a nuisance theory when he interferes with the flow of surface water across his land and the land owned by another is damaged as a result, either because water backs up on the neighbor's land, or the rate of flow is affected, or the direction or velocity of that flow is changed. *See* RESTATEMENT (SECOND) OF TORTS § 833 (1979). *Johnson* and *McRae* appear to definitively foreclose any such liability.

6

Beyond this, the plaintiff appears to argue that if the water discharged through Blagojevic's drainage system *creates* a watercourse, then Blagojevic is liable for any damage caused by the watercourse. The Law Court's holdings in *Johnson, Pettengill* and *Morrison* do not support this view of the law. Those cases hold that changes to an existing watercourse, resulting in damage, can constitute the basis for civil liability. Conversely, those cases do not hold that if a landowner reconfigures the drainage patterns in a way that creates a new watercourse, the landowner is liable. The fundamental principle underlying these cases is that due to his proprietary rights in his land, a landowner is free to make wholesale changes in the flow and dispersal of surface water from his property, without regard to the effects of those changes on his neighbor's land. However, if those changes result in drainage onto the neighbor's property of surface water that otherwise would not have ended up there, then the landowner is exposed to liability. Further, because of the interest held by the public and property owners in a watercourse, if the landowner affects that watercourse, then that party is liable.

Here, the plaintiff has not alleged that the defendant has obstructed or otherwise affected an existing watercourse, and such an allegation cannot be inferred fairly from the express allegations. Consequently, Blagojevic could not be found liable on this basis. However, the pleadings are adequate to articulate a claim that the drainage system that Blagojevic intends to construct would result in the introduction of water onto the plaintiff's property that otherwise would not flow there. For this reason, the allegations in count 4 state a claim on which relief could be granted.

The entry shall be:

For the foregoing reasons, the motion to dismiss filed by defendants Milos Blagojevic and Bonnie Blagojevic is granted in part and denied in part. Counts 2 and 3 of the complaint are dismissed. The motion to dismiss count 4 is denied.

Dated: June 27, 2003

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

7

Date Filed __08/13/2002__ ____Penobscot____ Docket No. ___AP-2002-24___
                            County                 **TITLE TO REAL ESTATE IS INVOLVE**

Action __Rule 80B Appeal_____          6/30/03   COUNTS 2 & 3 DISMISSED.
  **ASSIGNED TO JUSTICE JEFFREY L. HJELM**


                                        MILOS BLAGOJEVIC
                                        BONNIE BLAGOJEVIC  and
CHRISTOPHER RIOUX                     vs.INHABITANTS OF THE TOWN OF ORONO

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Robert Miller Esq<br>P O Box 414<br>Old Town ME  04468-0414 | GRIFFIN & JORDAN, LLC<br>68 MAIN ST - P O BOX 220<br>ORONO, ME  04473<br>BY:   CHRIS RUGE, ESQ.,<br>       MICHAEL H. GRIFFIN, ESQ.<br>FOR:  MILOS & BONNIE BLAGOJEVIC |
| **Date of<br>Entry** | FARRELL, ROSENBLATT & RUSSELL<br>61 MAIN ST - P O BOX 738<br>BANGOR, ME.  04402-0738<br>BY:   THOMAS A. RUSSELL, ESQ.<br>FOR:  INHABITANTS OF THE TOWN OF ORONO |

| Date of Entry | |
|---|---|
| 8/13/02 | Complaint (Title to Real Estate Involved) filed. |
| 8/13/02 | Notice and Briefing Schedule 80B Appeal of Governmental Actions forwarded to attorney for Plaintiff and to Defendants at address on Summary Sheet. |
| 8/14/02 | Notice of Assigned Justice filed.  Pursuant to Administrative Order, Single Justice Assignment of Civil Cases, Docket No. SJC-323, the above referenced case is specialy assigned to Justice Jeffrey L Hjelm.  Copy forwarded to attorney of record. |
| 8/16/02 | Motion For an Order to Specify the Future Course of Proceedings and <u>Incorporated Memorandum</u> filed by Plaintiff.  (attachments attached) |
| 8/16/02 | Affidavit of Christopher Rioux in Support of Motion to Specify the Future Course of Proceedings filed by Plaintiff. |
| 8/16/02 | Request for Hearing filed by Plaintiff on Motion to Strike Appearance, non-testimonial, good faith estimate of one-quarter hour. |
| 8/20/02 | Acceptance of Service as to Defendant Inhabitants of the Town of Orono filed by Defendant, Town of Orono.  (s.d. 8/16/02 by Thomas Russell, Esq.) |
| 8/20/02 | Acceptance of Service as to Orono Planning Board filed by Defendant Town of Orono.  (s.d. 8/16/02 by Thomas Russell, Esq.) |
| 8/21/02 | Request for Hearing on Plaintiff's Motion for an Order to Specify the Future Course of Proceedings filed by Plaintiff. |
| 8/22/02 | Clerk's Certificate filed.  (Attested copy forwarded to Plaintiff's Attorney.) |

STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-02-24

JLH-PEN-7/1/2003

DONALD L. GARBRECHT
LAW LIBRARY

JUL 30 2003

Christopher Rioux,
    Plaintiff/Appellant

FILED & ENTERED
SUPERIOR COURT

JUL 0 1 2003

PENOBSCOT COUNTY

v.

Order

Milos Blagojevic et al.,
    Defendants/Appellees


On the court's own motion, the caption of the Order on Appeal dated June 23, 2003, is corrected to identify Christopher Rioux as the appellant.


Dated: June 30, 2003

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-02-24
JLH - PEN-6/7/2004

Christopher Rioux,
    Plaintiff/Appellant

DONALD L. _____
LAW _____

JUN 17 2004

v.

Order on Appeal

FILED & ENTERED
SUPERIOR COURT

JUN 07 2004

PENOBSCOT COUNTY

Milos Blagojevic et al.,
    Defendants/Appellees

In July 2002, the Town of Orono Planning Board approved the proposed plan of Milos Blagojevic and Bonnie Blagojevic (collectively, Blagojevic) to develop a residential subdivision in that municipality. Christopher Rioux, an abutter of the site of the proposed subdivision, filed an appeal of the Board's decision to this court. In a decision issued in June 2003, the court remanded the proceeding to the Board to allow the Board to address explicitly and issue findings on two aspects of the subdivision plan, namely, whether Blagojevic's plan justified a waiver of the Town's ordinances requiring a sidewalk and whether the plan complied with the ordinances' standards for water drainage. The court retained jurisdiction over this case pending that remand, which allowed the parties at bar to proceed contemporaneously with Rioux' independent claim for relief.[1] In August and September 2003, the Board held two public hearings. After the second of those hearings, the Board issued findings on the two matters that the court

---

[1] Shortly after this case was remanded to the Board in June 2003, the court granted the defendants' motion to dismiss two of the plaintiff's three independent claims, which sought relief on the grounds that the proposed subdivision would violate orders issued by a state agency and that it would violate the Town's land use ordinance. Subsequently, the court entered summary judgment in favor of the defendants on the remaining count, which alleged the tort of trespass. Thus, Rioux' appeal from the Board's decision is the only outstanding issue in this case.

1

resubmitted to it. The parties then filed a supplemental record on appeal, consisting of material generated by the post-remand municipal proceedings, and the parties filed written argument. The court has considered this material.

**A. Preliminary matters**

Several of the parties' submissions have spawned motions that relate to the scope of the record and the timeliness of written argument. First, Blagojevic has move to strike Rioux' reply brief because that brief was filed one day late. Pursuant to the December 3, 2003, scheduling order, Rioux was to file any reply within 10 days of the *filing* date of the defendant's written argument on appeal. Both defendants filed their written argument on February 27, which created a deadline of March 8 for Rioux' reply. In fact, it was filed on March 9. Blagojevic filed his motion to strike the very next day. The court denies Blagojevic's motion and grants Rioux' responsive motion to enlarge, because Rioux' counsel's personal circumstances justify that one day extension. An enlargement of one day has not disrupted the appellate process. Further, the process for submitting briefs on appeal is unlike the more regimented process governing summary judgment motions that resulted in the court's order granting Blagojevic's summary judgment motion because Rioux' objection was filed late.

Additionally, Rioux has moved to exclude six items that Blagojevic submitted as additional elements of the record on appeal, accompanying his written argument on this appeal. Those items consist of video and audiotaped recordings of the Board's meetings in August and September 2003 (which are the post-remand hearings) (R. 59(a) – (e)), and Blagojevic's final subdivision map plans dated April 2002 (R. 34(a)).[2] The court treats these items as proper parts of the record and denies Rioux' motion.

First, when counsel communicated with each other regarding the composition of the record on appeal, the defendants specifically requested Rioux to include Blagojevic's final subdivision map plan in that record. This is revealed in Attorney Russell's letter dated October 9, 2002, which incorporated a list of exhibits that included the one at issue here (number 21 on that list), and by Attorney Ruge's letter dated October 11, 2003,

---

[2] Blagojevic also submitted a copy of the Board's minutes from a meeting held in October 2003, filed as R. 67. Rioux has not objected to that addition to the record on appeal.

adopting Attorney Russell's request. For some reason not apparent here, Rioux failed to include that map in the record. However, also for some reason not apparent here, the defendants' attorneys failed to raise any issue concerning the contents of the record in the manner prescribed by rule 80B(e). Thus, responsibility for this omission is shared among all counsel. The affidavit of the custodian of the Board's records reveals that the final plan was an exhibit included in the municipal proceedings. When this circumstance is combined with Rioux' opportunity to address any issues generated by the exhibit in his reply brief (filed after Blagojevic unilaterally submitted that exhibit along with his written argument), the court can only conclude that Rioux is not exposed to any unfair prejudice by the inclusion of the map as part of the record.

Second, the Board's written decision incorporates the electronic recording (audio and visual) of its proceedings. The record on appeal, as originally filed, includes transcripts from the two post-remand hearings. Nonetheless, because the Board made the audio and videotapes part of its decision, their inclusion in the record is mandatory. *See* M.R.Civ.P. 80B(e). Rioux should have included them in the record, although defendant's counsel failed to take any action in response to their omission. Rioux points to no prejudice occasioned by the integration of these tapes into the record. Under these circumstances, the court treats them as part of the record.

### B. Merits of the appeal

In presenting the merits of his appeal, Rioux contends that the Board issued inadequate post-remand findings; that the evidence did not support the Board's findings that Blagojevic's proposed subdivision warranted a waiver of the sidewalk requirement; and that the development plan does not satisfy the ordinance's requirements governing the discharge of water.. The court addresses Rioux' arguments regarding the sufficiency of the Board's findings in connections with his substantive arguments on the sidewalk and water discharge issues.

### 1. Waiver of the sidewalk requirement

Blagojevic's proposed development includes a road that would run from Forest Avenue and provide access to the houselots within the subdivision. This road would be a "minor street." *See* R. 8 at 5. Table 7.4 in section 18-210(e)(1) of the Town's land use ordinance requires streets in a subdivision to include a sidewalk that meets certain

3

standards for size and construction. *See* R. 1. Blagojevic's plan does not provide for a sidewalk, and at a Board meeting held on July 17, 2002, he requested that the Board grant waiver from the sidewalk requirement. Such a waiver is permissible if the Board finds that the requirement would create an "extraordinary and unnecessary hardship" or, alternatively, if "special circumstances" justified the waiver. *See id.* at § 18-82(a). Ultimately, in 2002 the Board approved Blagojevic's subdivision plan, but it did not expressly act on his waiver request, and it did not offer any findings to support a decision to grant such a waiver. Rioux had preserved his appellate challenge to this issue. Because a waiver can be granted on the basis of two independent reasons and because the Board failed to articulate the ground for its implied acquiescence to Blagojevic's request for that waiver, the court remanded the matter to the Board to allow it to express the reason why it apparently agreed that a waiver of the sidewalk requirement was proper.

When the Board initially considered Blagojevic's proposal on remand, it first decided to reopen the record to allow the parties and others to present additional evidence that would supplement the existing record. The Board made this decision over Blagojevic 's objection but with Rioux' support. During the first post-remand hearing, on August 20, 2003, the Board entertained the parties' presentations on the sidewalk issue and, to a more limited extent, on the issue of the subdivision's water discharge features. When the Board resumed the hearing, on September 17, 2003, it first considered (and allowed further presentations on) Blagojevic's request for a waiver of the sidewalk requirement. After the Board members asked questions of the presenters and discussed the issue among themselves, by a unanimous vote[3] they found that the sidewalk waiver was warranted.

---

[3] At the beginning of the August and September 2003 hearings, the Board's chair announced that only those Board members who were present at the 2002 hearings could vote on matters raised by the remand order. There were four such members. However, when it came time for the Board to vote on the sidewalk waiver issue, a fifth member, Eric Landis, voted. The written notice of decision issued by the Board correctly noted a 5-0 vote. *See* R. 59. Although it is less clear from the record, it also appears that Landis voted on the water drainage issues. Rioux makes a passing argument that it was improper for Landis to have voted. However, because the vote was unanimous, Rioux has not shown that any impropriety was material. At least as importantly, Rioux did not object or otherwise raise the issue of whether Landis should vote, even though he could have done so at a time when any error could have been remedied. In support of his argument that

4

In October 2003, the Board issued a written notice of its decision to Blagojevic. As it pertained to the sidewalk issue, the written notice merely stated that "the Board deliberated on the application and voted 5-0 to grant the waiver of the sidewalk requirement. . . ." *See* R. 59. The written notice did not identify which of the two provisions of the waiver ordinance justified the waiver, and it did not set out any factual findings to support that conclusion. Rather, the written notice provided: "For the Board's specific actions on the sidewalk waiver. . .and the Board's findings and reasons relative thereto, reference may be had to the minutes of the August 20[th] and September 17[th] meetings, which minutes, the audio and video recordings of the meetings, and the exhibits presented to the Board are incorporated herein by reference." *Id.*

An oral expression of a municipal agency's findings is proper if it otherwise achieves the purposes that such findings are required to serve, that is, that they are sufficiently clear and comprehensive to reveal the basis for municipal action and allow meaningful appellate review. *See Carroll v. Town of Rockport*, 2003 ME 135, ¶¶ 27-28, 837 A.2d 148, 156. There is a danger inherent in a format where a written decision merely incorporates the oral statements of the decision-makers, because the ultimate findings, to be proper, must reflect the basis for a board's action rather than "the views of the individual members" of that board. *See id.*, ¶ 28, 837 A.2d at 156. In other words, the oral statements that appear in a transcript or other memorialization of a hearing must reveal the "collective judgment of the fact-finding agency" rather than its members' "individual opinions." *Id.*, ¶ 29, 837 A.2d at 157. A written expression of the factual basis underlying a decision is more likely to set out a unified explanation for that decision

---

Landis' participation was improper, he cites authority that the voting members must have been present when the evidence was presented. In its written argument, the Town suggests that Landis in fact watched the videotapes of the 2002 hearings, when much of the evidence was presented. The court does not treat the Town's assertions as a matter of record, because the record is silent on this issue. However, as the Town explains, if Rioux had objected to Landis' inclusion in the group of Board members who voted at the September 2003 meeting, that objection could have been countered by the information that the Town advances here. Thus, had Rioux raised the issue in a more timely way, either the error (if it was one) could have been corrected, or the reasons for Landis' decision to vote could have been developed on the record. Under these circumstances, the court can only conclude that Rioux has waived any challenge to the voting process. *Oliver v. City of Rockland*, 1998 ME 218, ¶ 7, 710 A.2d 905, 907.

and is less likely to run the risk associated with individual statements of individual board members, expressed at a hearing itself.

Here, at the August 20 meeting, Blagojevic told the Board that his waiver request was not based on a contention that the requirement would create "extraordinary and unnecessary hardship," which is the first of the two alternative circumstances that, under section 18-82(a), would justify such a waiver. *See* R. 30 at p. 4. Similarly, at the September 17 hearing, Blagojevic's attorney argued that the sidewalk requirement should be waived because of special circumstances: the remoteness of the subdivision's location; the absence of any other sidewalks in the area that could be connected to a sidewalk in the development; the limited width of the right-of-way where the road itself would be located; and the nature of the shoulders of the road, which would accommodate pedestrian traffic. *See* R. 61 at p. 5. After hearing the parties' presentations, the five voting Board members expressed their positions and announced their votes. Eric Landis said that in his view, the sidewalk requirement would not create a hardship but that the waiver was warranted because of special circumstances, namely, the combination of "geography and topology." *Id.* at p. 16. David Sewell agreed with Landis, but also added that a sidewalk is "not feasible" at that location. *Id.* Next, Christa Schwintzer "agree[d]" that there were special circumstances because the area was remote, the volume of vehicular traffic would be low, and the shoulders would provide a place for people to walk safely. *Id.* David Thompson and then Michael Tuell then agreed, and Tuell specifically cited the rural setting of the subdivision. *Id.* at pp. 16-17. Then, without any explicit discussion of the issue, the Board members unanimously concluded that the effect of the waiver would not nullify the purposes of the ordinance. *Id.* at p. 17.

This record clearly reveals the bases for the Board's decision: a waiver was warranted because of "special circumstances," and that those circumstances consisted of the remote location of the development, the correspondingly light vehicular flow and the availability of safe walking areas for pedestrians and others who would use sidewalks otherwise. The Board members referred to the prior comments made by their colleagues during the deliberation and voting process, thus creating an internal harmony among their

6

views.[4] Thus, here, the dangers that can affect oral findings that consist of the collected comments of individual decision-makers were not realized.

Further, the Board members explicitly found that a sidewalk waiver would not compromise the larger objectives of the ordinance. The discussion preceding the vote focused on the safety of pedestrians in the absence of a sidewalk. Safety is a goal (and the only one of relevance in this context) that the Town's land use ordinance is intended to promote. *See* R. 1 at § 18-3. Indeed, Rioux' attorney argued to the Board that sidewalks were important to provide safe passage to pedestrians. *See* R. 61 at p. 13. Blagojevic presented evidence that in this setting, the absence of a sidewalk would not have safety implications. *See id.* at pp. 6 (safety data), 9-10 (comments of an engineer regarding the suitability of the shoulders for walking). Thus, by finding that the absence of sidewalks would not compromise the goals of the ordinance, it is manifest that the Board also found that – as they had discussed – that sidewalks were not necessary to create a safe environment for pedestrians.

The next question is whether the evidence warranted the Board in reaching these conclusions. Plainly, it did. Among other things, the Board heard evidence that the site of the subdivision is not proximate to developed area, thus reducing the volume of pedestrian traffic because there are no nearby locations where pedestrians are likely to come or go. There are no other adjacent or nearby sidewalks that otherwise would promote pedestrian traffic. The houselots within the subdivision would be located a considerable distance from the beginning of the interior road, which intersects with Forest Avenue, a more frequently traveled way. This means that pedestrians would be more isolated from that through traffic. And, in response to a keen interest of the Board members, Blagojevic presented detailed evidence regarding the adequacy of the shoulders of the road for use by pedestrians. This evidence was a sufficient basis for the members' conclusion that those shoulders would allow pedestrians to proceed safely.

Based on this evidence, the Board was entitled to conclude that special circumstances, namely, ones unique to the particular setting for the proposed

---

[4] Sewell appears to have found both special circumstances and a hardship. *See* R. 61 at p. 16. In light of the former, the latter is superfluous and does not undermine the common reasoning among the members.

7

development, alleviated the need for a sidewalk and that the goals of the ordinance would not be undermined. *See Kurlanski v. Portland Yacht Club*, 2001 ME 147, ¶ 7, 782 A.2d 783, 784 (sufficiency of the evidence presented to municipal board).

## 2. Water drainage

Rioux makes five separate arguments to support his contention that the Board erred in finding that Blagojevic's subdivision plan satisfies the Town's land use ordinances governing water drainage: the Board's findings are insufficient; the recorded plan information regarding the drainage systems is inadequate; the downstream drainage system is not adequate; the Board did not properly account for drainage easements; and the Board could not have approved the plan in an informed way because it would be supplemented by modifications that would be filed sometime in the future

### (a) Sufficiency of the Board's findings

At the Board's September 17 hearing, after it had approved Blagojevic's request for the sidewalk waiver, the Board considered the water drainage issue. As is noted above, the Board chose to re-open the hearing to allow submission of additional evidence. After entertaining additional evidence from Blagojevic and Rioux (including presentations by their attorneys, and the consideration of documentary evidence from engineers representing the interests of Blagojevic, Rioux and the Town itself), the Board closed the hearing to further evidence. It then individually addressed the six distinct provisions of the Town's ordinance governing drainage facility design (section 18-210(c)), as well as the pertinent statute (30-A M.R.S.A. § 4404(16)).[5] After the Town's chair identified one of those provisions, a Board member would make a motion (seconded in each instance) that the Board find that Blagojevic's plan satisfied the particular requirement embodied in that respective law. The chair then opened the matter for discussion. In all but one instance, there was at least some discussion. The discussion would be closed after full opportunity for such discussion. Ultimately, in each instance, the Board voted unanimously to approve the separate motions that the proposed plan satisfied the legal requirement at issue.

---

[5] The framework for this analysis was suggested by the Town's attorney in a memorandum he submitted to the Board members (with copies to the parties' attorneys) prior to the meeting. *See* R. 51. The Board adopted the approach recommended by counsel, not only with regard to the drainage issue but also to the sidewalk waiver.

With the exception of section 18-210(c)(4), each of the pertinent provisions of the land use ordinance are framed in terms of factual propositions rather than qualitative or judgmental assessments. Thus, by finding that the proposed subdivision satisfied the criteria set out in the five other sections, the Board manifestly made the factual findings embodied in those standards. Those findings are therefore clear on the record, are adequate for appellate review, and otherwise accomplish the objectives of such findings. As to the remaining provision, section 18-210(c)(4) appears to apply only to developments in "floodplains." Under the Town's ordinances, however, "floodplains" consist of specifically defined areas in the Town. *See generally* section 18-231 *et seq.* Blagojevic's proposed subdivision is not located within a floodplain. Unlike the other five provisions within section 18-210(c), section 18-210(c)(4) would require the Board to exercise some level of judgment in assessing whether life is protected and losses are "minimized" in the face of flood hazards. If this provision were applicable, the Board might be required to articulate the basis for its evaluative conclusion. However, because this section does not apply, no such findings were necessary.

For these reasons, the court concludes that the Board's up-or-down vote on the factual propositions embodied in the applicable sections of section 18-210(c) made clear the findings for its decision that the proposed subdivision satisfied this portion of the ordinance.

### (b) Plan information

Rioux argues that the final plan of the subdivision omits information that is required by the ordinance and enumerated in table 7.2 of section 18-207(c)(2). Earlier in this order, the court has allowed the record on appeal to be supplemented by exhibit 34 (a), which is the set of final subdivision plans that include the requisite information. In his reply brief, Rioux argues that the record does not clearly show that this document was presented to and considered by the Board. The affidavit of the Town's custodian of records, submitted by Blagojevic in support of his argument that exhibit 34(a) should be part of the record, indicates that this material in fact was submitted to the Board. Even, however, if the use of that affidavit is limited to the procedural question of whether exhibit 34(a) should be part of the record on appeal, the undisputed portion of the record (specifically, R. 46) includes the first sheet of substantive information from exhibit 34(a),

which is designated "Sheet 1 of 6." This suggests that it was only one page from a larger package. In the absence of a more persuasive argument that Blagojevic did not present the Board with the full set of drawings, the court is willing to infer that the Board received the entire set, thus satisfying section 18-207(c)(2).

Rioux also argues that Blagojevic failed to record the final subdivision plan, setting out all of the information required by table 7.2, with the Registry of Deeds. Rioux made the same argument, virtually verbatim, when this case was first before the court in 2003. None of the parties (including Rioux) appears to provide a specific reference to the provision of the ordinance governing the Registry filing. In the absence of such direction, from the substance of Rioux' argument, the court assumes that it flows from the terms of section 18-207(b)(2)(c). That section of the ordinance requires that "[t]he subdivider shall file a signed subdivision plan at the County Registry of Deeds within 90 days of the date of approval." Blagojevic, in his written argument, does not contend that he recorded the entire final plan as approved by the Board. Rather, Blagojevic argues that the items listed in table 7.2 must be included in a final "submission," as distinguished from a final "plan." This argument is undermined by the ordinance's description of table 7.2, namely, "CONTENTS OF FINAL *PLAN*." (Emphasis added.)

Nonetheless, the court concludes that in the circumstances of this case, the omission of part of the final plans is not material and fatal to the development. The evident purpose of the recording requirement is to place the world on notice of the prospective development. By filing the page with the designated lot locations, road locations and drainage easements, the developer has satisfied that central objective. Here, the omitted pages show the stormwater and erosion control design for the land within the subdivision and in the immediately adjacent area, and they show the pre- and post-development drainage pattern. The only other page with substantive information depicts construction detail, such as spillway and crosscut cross-sections. The page filed by Blagojevic makes reference to the existence of other pages, which are the other pages included in exhibit 34(a). Therefore, even if section 18-207(b)(2)(c) required Blagojevic to file the complete plan drawings as approved by the Board, the court concludes that when he filed the page showing the location of the lots, the road and the drainage

10

easements, he substantially satisfied the provisions of the ordinance to a degree sufficient to accomplish its objectives.

### (c) Downstream drainage facilities

Rioux challenges the sufficiency of the evidence that the Board considered when it concluded that the proposed development satisfied the criteria set out in sections 18-210(c)(2)(a) and (b) and section 18-210(c)(3). His argument on this point is precise: a culvert located on the plaintiff's property, running under his driveway, is not adequate to carry the runoff that will be created by the development, which is located upstream of his land. Rioux argues that this drainage dynamic means that the subdivision's drainage facility will not accommodate water runoff, thus violating section 18-210(c)(2)(a). For the same reason, he urges that section 18-210(c)(2)(b) is implicated because the water drainage plan for the subdivision will not sufficiently manage stormwater. Finally, he argues that the "existing downstream drainage facility" (namely, his culvert) will be overloaded, in violation of section 18-210(c)(3).

The Board, however, was presented with evidence that the subdivision drainage design will actually *reduce* the flow of water from the subdivision site onto Rioux' property. This evidence was presented by Blagojevic's engineer, who calculated projected runoff for 2, 10 and 25 year events, which are the reference points for the ordinance's requirements. *See* R. 57. The engineer retained by the Town to evaluate Blagojevic's development plans and then to monitor actual construction agreed that the rate of waterflow from the subdivision site onto Rioux' land would not increase. *See* R. 61 at pp. 32-33. From this and other similar evidence, the Board was warranted in concluding that the drainage design in fact would manage and accommodate water runoff as required by sections 18-210(c)(2)(a) and (b) of the ordinance.

Further, the Board was entitled to conclude that the drainage design satisfied section 18-210(c)(3). That provision requires the Board to deny a subdivision plan when "*additional* runoff incident to the development of the subdivision will overload and existing downstream drainage facility during a storm up to a 25-year event. . . ." (Emphasis added.) The plain language of this provision requires the Board to focus on the incremental effect that the development will have on downstream drainage. Both the terms of section 18-210(c)(3) and a common sense construction of the ordinance lead to

the conclusion that if the downstream drainage facility is inadequate even prior to the creation of the subdivision, an otherwise adequate drainage system integral to the subdivision is not deemed to be flawed. The ordinances at issue require an assessment of whether the subdivision's drainage system is adequate and, more specifically, whether it will avoid any increased burden on the downhill facilities and properties. Here, by finding that the drainage system comported with section 18-210(c)(3), the Board concluded that the drainage system for the development would not adversely affect the existing drainage conditions affecting Rioux' property. The evidence warranted this finding.

### (d) Public drainage facilities

Section 18-210(c)(5) requires that "easements for public drainage facilities be turned over to the Town." In fact, Blagojevic stated his intention to do so, and the Board accepted that proposal in the form of a requirement, in order to satisfy the ordinance's mandate. Here, Rioux contends, first, that the Board failed to determine whether Blagojevic was obligated to obtain easements in order to allow the discharge of water onto his (Rioux') property, and, second, that if Blagojevic was required by law to do so, the Board did not require Blagojevic to obtain those easement rights.

This ordinance does not impose a requirement that a developer obtain easements for public drainage facilities. It merely requires that any such interests be conveyed to the Town. There can be no argument on this record that the Board failed to ensure this prospective arrangement.

Rioux' argument seems to be that the proposed drainage system will create a burden on his property that would necessitate the owner of the dominant estate (the subdivision property) to first obtain an easement from him. Even if the ordinance obligated the Board to sort out the legal issues arising from these private property interests (an analysis that the court rejects here), it is a contention that has been resolved in this case already. In count 4 of his complaint, Rioux asserted an independent and direct claim against Blagojevic, alleging that the water discharge system included in the subdivision plan would amount to an improper discharge of water onto Rioux' property (complaint as amended at ¶ 26), that the "artificial drainage system will result in an illegal entry of water onto [Rioux'] property" causing damage to that property (*id.* at ¶

12

28), that the proposed drainage system would constitute a trespass (*id.* at ¶ 29), and that Blagojevic do not have an easement that would give him the right to create that drainage pattern (*id.* at ¶ 25). After the court denied Blagojevic's motion to dismiss count 4, Blagojevic filed a motion for summary judgment on that count. The parties presented legal argument on the substantive point raised here by Rioux (arguments which were identical to the presentations on the motion to dismiss). The court granted Blagojevic's motion, and summary judgment was entered on count 4.[6] With the entry of an adverse judgment (although it is not a final one because the count under rule 80B remains pending, *see* M.R.Civ.P. 54(b)), Rioux cannot now argue the merits of a claim that has been addressed and dispositively resolved adversely to him.

Therefore, even if the Board had been required to consider and adjudicate the merits of Rioux' easement argument, as opposed to simply requiring that Blagojevic convey any relevant easement to the Town, Rioux is barred from contending that Blagojevic needs to obtain an easement from him as a condition to obtaining plan approval from the Board.

### (e) Future submission of plans

Finally, Rioux argues that the Board approved a plan that was subject to future modification and, in effect, gave Blagojevic carte blanche on some aspects of the development. While the portion of the Board's hearing relevant to this issue lost some degree of clarity, the court concludes that the plan to be submitted in the future actually will be a plan of the development as constructed rather than the plan it approved.

While this case has been on appeal and on remand, Blagojevic has proceeded with construction of the development. Close in time to the September 2003 Board hearing, Rioux' engineer, the Town's engineer, and Blagojevic's engineer visited the site to inspect the progress of construction. All noted some deviation between the subdivision plans as set out on paper and the actual construction. This led to some discussion among Board members and other participants about whether the Board's function was to approve the design plans as shown in the application or whether its decision should be based on the implementation of those plans on the ground. *See, e.g.,* R. 61 at pp. 20-21, 28

---

[6] Summary judgment was granted because Rioux' opposition to the motion was not timely. This, however, does not affect that result.

13

(comments of Town's attorney), p. 21 (comments of Town's CEO), p. 25-27 (comments of Town's engineer). Although Rioux urged the Board to take into account the site inspection information, the Board concluded that any departure from the plans during the construction process were enforcement issues within the province of the municipal code enforcement officer. Instead, it viewed its role as evaluating the proposed subdivision as revealed in the application and deciding on that basis whether the plan conformed to the ordinance.[7] Then, when the Board proceeded to its deliberations, the discussion among the Board members was limited to the plans themselves. This further demonstrates that the Board issued its ultimate approval and its subsidiary facts based on Blagojevic's proposal rather than based on the actual construction.

Thus, the environment of the Board's decision reveals that it approved the development as shown in the plans and that the Board was not passing judgment on the construction itself. This approach was proper, because the Board's adjudicative powers do not extend to questions of enforcement, which fall within the CEO's jurisdiction. *See* R. 1 at §§ 18-41, 18-42.

However, after the Board concluded its voting on the development design, the Town's attorney suggested that the Board also require Blagojevic to submit "a new plan. . .showing the conditions that were outlined" in a report submitted by the Town's engineer. *See* R. 61 at p. 36. That report followed a site inspection that the engineer had conducted the day prior to the September 17 meeting. In that report, the engineer noted several departures from the design plans. *See* R. 56. This recommendation prompted a discussion about the nature of the "new plan," including the specific question of whether it would show the development as built (what the Town's engineer described as a "record drawing," *see* R. 61 at p. 37) or whether it would constitute a new design. That discussion wound down with comments from a Board member that the submission would be a "record of what's on site. . . ." *Id.* at p. 39. Blagojevic's engineer understood it to be a filing that would be "part of the inspection. . .[showing] the small, small changes that are being made." *Id.* In the end, the Board unanimously agreed to require Blagojevic to

---

[7] Following the discussion of the Board's role, the chair inquired of the Board members whether any of them felt that "we need to get into enforcement of the actual, what's actually on the ground there. . ." None of the members responded to this invitation.

14

"submit a revised plan showing the matters outlined in. . .[the Town engineer's] report dated September 16, 2003. . . ."

The court does not construe this discussion and resolution to change the terms of the approval that the Board had just given to Blagojevic's plans as shown on paper. The Board had been advised that Blagojevic, through his engineer and contractors, had departed from the plans. The Town's engineer told the Board that some departures are immaterial, and both the CEO and the Town's attorney noted that problems on site can be addressed in several different ways (for example, by initiating a violation proceeding, or by the Town's decision not to accept a dedication of the roadway). Thus, the terms of the concluding discussion, particularly when seen in light of the Board's apparent agreement earlier in the meeting to evaluate the plan as it was proposed (rather than as built), suggest that the Board imposed on Blagojevic a requirement to file plans of the actually constructed subdivision in order to assist the appropriate municipal officials in their task of evaluating the implementation of the plan. Against this background, the court rejects Rioux' position that the Board approved the development plan even before the final plan was fully presented to the Board.

The entry shall be:

For the foregoing reasons, Blagojevic's motion to strike is denied. Rioux' motion to enlarge is granted, and his reply brief is deemed timely. Rioux' motion to exclude proposed exhibits is denied. The decision of the Town of Orono Planning Board is affirmed.

Dated: June 4, 2004

_____
Justice, Maine Superior Court

15

Date Filed 08/13/2002     Penobscot     Docket No. ___AP-2002-24___
                            County            **TITLE TO REAL ESTATE IS INVOLVED**

Action _Rule 80B Appeal_         6/30/03   COUNTS 2 & 3 DISMISSED.
                                  10/24/03   COUNT 4 - SUMMARY JUDGMENT
  **ASSIGNED TO JUSTICE JEFFREY L. HJELM**              ENTERED FOR DEFENDANTS BLAGOJEVI

                                        MILOS BLAGOJEVIC
                                        BONNIE BLAGOJEVIC   and
CHRISTOPHER RIOUX             vs. INHABITANTS OF THE TOWN OF ORONO

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| Robert Miller Esq<br>P O Box 414<br>Old Town ME   04468-0414 | GRIFFIN & JORDAN, LLC<br>68 MAIN ST - P O BOX 220<br>ORONO, ME   04473<br>BY:    CHRIS RUGE, ESQ.,<br>        MICHAEL H. GRIFFIN, ESQ.<br>FOR:   MILOS & BONNIE BLAGOJEVIC |
| | FARRELL, ROSENBLATT & RUSSELL<br>61 MAIN ST - P O BOX 738<br>BANGOR, ME.   04402-0738 |

Date of Entry                        BY:    THOMAS A. RUSSELL, ESQ.
                                     FOR:   INHABITANTS OF THE TOWN OF ORONO

| Date of Entry | |
|---|---|
| 8/13/02 | Complaint (Title to Real Estate Involved) filed. |
| 8/13/02 | Notice and Briefing Schedule 80B Appeal of Governmental Actions forwarded to attorney for Plaintiff and to Defendants at address on Summary Sheet. |
| 8/14/02 | Notice of Assigned Justice filed. Pursuant to Administrative Order, Singl Justice Assignment of Civil Cases, Docket No. SJC-323, the above reference case is specialy assigned to Justice Jeffrey L Hjelm. Copy forwarded to attorney of record. |
| 8/16/02 | Motion For an Order to Specify the Future Course of Proceedings and Incorporated Memorandum filed by Plaintiff. (attachments attached) |
| 8/16/02 | Affidavit of Christopher Rioux in Support of Motion to Specify the Future Course of Proceedings filed by Plaintiff. |
| 8/16/02 | Request for Hearing filed by Plaintiff on Motion to Strike Appearance, non-testimonial, good faith estimate of one-quarter hour. |
| 8/20/02 | Acceptance of Service as to Defendant Inhabitants of the Town of Orono filed by Defendant, Town of Orono. (s.d. 8/16/02 by Thomas Russell, Esq.) |
| 8/20/02 | Acceptance of Service as to Orono Planning Board filed by Defendant Town of Orono. (s.d. 8/16/02 by Thomas Russell, Esq.) |
| 8/21/02 | Request for Hearing on Plaintiff's Motion for an Order to Specify the Future Course of Proceedings filed by Plaintiff. |
| 8/22/02 | Clerk's Certificate filed. (Attested copy forwarded to Plaintiff's Attorney.) |

STATE OF MAINE - DEFENDANT

Attorney for: STATE OF MAINE
DENNIS HARNISH
OFFICE OF THE ATTORNEY GENERAL
6 STATE HOUSE STATION

AUGUSTA ME 04333-0006

Filing Document: COMPLAINT                    Minor Case Type: QUIET TITLE